**ANADARKO PRODUCTION COMPANY, Plaintiff,**

v.

**Ross E. TAYLOR, et al., Defendants.**

**Civ. No. 79-1111.**

United States District Court, D. Kansas.

March 10, 1982.

Jack D. Sage, Wichita, Kan., for plaintiff.

Bernard Nordling, Hugoton, Kan., for defendants Taylor, Coulter, Webb, Phillips, Peterson, Ubelhart and French.

Gene H. Sharp, Liberal, Kan., Mark E. Singer, Wichita, Kan., for defendants Chapline.

Robert J. Spayde, Oskaloosa, Iowa, for defendants Butler and Cauldwell.

Mark H. Adams, Wichita, Kan., for defendants Sidwell.

Charles J. Woodin, Wichita, Kan., for defendant Texaco, Inc.

Ferd E. Evans, Jr., Wichita, Kan., for defendants Huffman, and Derrick.

Paul A. Wolf, Hugoton, Kan., for defendant Herbel.

## MEMORANDUM AND ORDER

### (As Revised by Order 3/16/82)

KELLY, District Judge.

Pending before the Court are a partial summary judgment motion filed by the plaintiff, Anadarko Production Company (Anadarko), and a crossing partial summary judgment motion filed by some of the defendants jointly. The remaining defendants support the plaintiff's motion, and all of the parties seek the Court's interpretation of various natural gas leases and agreements. At issue here is the applicability of a natural gas unit agreement control-ling gas production from a well since 1944 to a second and much newer well drilled in 1975. Although the newer well is located on the acres included in the unit, it is producing gas from a geological formation completely distinct from the formation being drained by the first well on the unit's acreage. The landowners of the tract where the newer well is located contend that the unit agreement only applies to gas production from the geological formation or horizon which the first and older well drains, the Hugoton formation. The other landowners in the unit arrangement, as well as the gas production company, contend that production and royalties from the second, newer well are controlled by the unit agreement and that these landowners are entitled to royalties from the newer well. Since an impasse arose regarding royalties from the new well, Anadarko filed the instant interpleader action against all of the landowners in the gas production unit to obtain a judicial determination of to whom it is to pay the additional royalties.

After a review of all the pertinent instruments, the applicable case law and counsels' well prepared arguments, the Court finds that gas production and royalties from the second, newer well are not covered by the instruments discussed below. The following is the Court's narrative findings of fact and conclusions of law.

## I. INTRODUCTION

Plaintiff is a Delaware corporation, and federal jurisdiction for its suit is based on 28 U.S.C. § 1335. The plaintiff's predecessor in interest in all of the suits, the Stevens County Oil and Gas Company, signed an oil and gas lease in 1935 with the owners of the Northwest Quarter (NW/4) of Section Fifteen (15), Township Thirty-four (34) South, Range Thirty-eight (38) West, Stevens County, Kansas. [The plaintiff is also the successor in interest of D. D. Harrington and the Panhandle Eastern Pipe Line Co., but to avoid confusion all of the lessees and sublessees shall be referred to here as the "production company"]. A commercial gas well was completed on the above quar-

ter section in 1936, and it began producing from the Hugoton formation. The next significant event in this case occurred in 1943 when the production company signed oil and gas leases with parties owning land adjacent to the above quarter section. (For reference, a map of the various tracts is attached hereto). In August of 1943, Marie Stout, predecessor in interest to Ross E. Taylor and Bertha Taylor ("Taylor" defendants), leased the entire and individual mineral interest in the Southeast Quarter (SE/4) of Section 16 to the production company, and in the same instrument she leased an undivided ½ mineral interest in the Northeast Quarter (NE/4) of Section 16 to the production company. In the same month, by separate instruments, the other owners of individual interests (aggregating an undivided ½ interest) in the NE/4 of Section 16 leased mineral interests to the production company. In addition, the owners of an undivided one-half (½) mineral interest in the Southwest Quarter (SW/4) of Section 10 leased said interest to the production company on August 8, 1943.

On March 21, 1944, the Kansas State Corporation Commission (KCC) promulgated the Basic Proration Order for the Hugoton Gas Field ("Hugoton Basic Order"). One of the purposes for this action by the KCC was the regulation of the production rates from all wells drawing from the Hugoton formation. Due to the regulations imposed by the Hugoton Basic Order, the production company and all of the above parties signed a multilateral consolidation agreement on July 8, 1944. The result of this agreement was the creation of a gas production unit of four hundred and eighty (480) acres. The purpose and intent of the parties to this Agreement was to consolidate an additional one hundred and sixty (160) acres into a gas production unit in order to obtain the maximum allowable production rate under the Hugoton Basic Order from the well drilled in 1936 in the NW/4 of Sec. 15.

Since the production company was only able to obtain an undivided one-half (½) mineral interest in the SW/4 of Sec. 10 through the lease executed on August 3, 1943, the production company needed to obtain the remaining one-half (½) mineral interest in this tract. On February 10, 1945, the Texas Company (predecessor in interest of Texaco, Inc., a defendant herein) owned and leased to the production company the remaining undivided one-half (½) mineral interest in the SW/4 of Sec. 10. This lease was subsequently modified on or about January 4, 1946, by the Texas Company and the production company.

The Court notes that according to the complaint the plaintiff Anadarko Production Company only operates the well producing gas since 1975 from the Panoma-Council Grove formation. The production company operating the older well producing from the Hugoton formation had earlier leased to the plaintiff the production rights for all geological formations below the Hugoton formation, and this includes the Panoma-Council Grove horizon. Consequently, the plaintiff does not operate the well producing from the Hugoton horizon.

## II. POOLING AND UNITIZATION

In order to decide the pending summary judgment motions, this Court must necessarily interpret all of the above instruments and other related agreements which will subsequently receive the Court's attention. However, a general discussion regarding the nature of unit agreements would be appropriate first.

The theory of pooling and unitization was first widely discussed in the mid–1920's as a means to achieve conservation of oil and gas and to achieve greater efficiency in their production from the field. Oil and gas engineers were initially in the forefront of the movement for the acceptance of unitized production. See Myers, "The Law of Pooling and Unitization," § 1.02 (2nd ed. 1967). Unitization is based on the practical fact that a single mineral lease described by surface boundary lines generally will not cover an entire field or even a substantial portion of it. Prior to pooling and unitization, unnecessary wells were often drilled on adjacent tracts because a well could drain gas or oil from a formation extending

under a neighboring tract of land. Consequently, unitization represents:

> ... a deliberate effort to consolidate all, or a sufficiently high percentage of the royalty and working interests in a pool as will permit reservoir engineers to plan operation of the pool as the natural energy mechanism unit which it is. This means taking production at the locations and rates it is most efficient to take it, without disruption of the scheme by the legal rights inhering in competing properties. In the case of secondary recovery and pressure maintenance units it means injecting gas and fluids where these will most efficiently aid in expelling reservoir contents, again without the scheme being disrupted by property lines, or the withdrawal by a competing producer of the gases and fluids injected at great expense. To realize the significance of what is attempted it must be appreciated an oil pool is a highly complex energy mechanism, capable of desirable and undesirable responses depending on how it is handled. The artificial property lines man has drawn upon these pools, coupled with the lessor/lessee rights and obligations arising from competitive production methods sanctioned or even required by law, make virtually impossible maximum ultimate recovery in the absence of unitization, and this is true even though a state has otherwise excellent conservation regulations to limit the worst rule of capture competitive producing practices.

5 Summers, Oil and Gas § 951, p. 55 (1966).

In Kansas the State Corporation Commission first provided for the orderly development and production of gas from the Hugoton Field in the early 1940's when the KCC issued Basic Proration Orders for the Hugoton Gas Field in 1942 and 1944. Here the KCC noted that in Kansas the Hugoton Field was 65 miles long and 40 miles wide, and that at that time there were 252 gas wells producing from the Hugoton Field. *Republic Natural Gas Co. v. Baker*, 197 F.2d 647, 648 (10th Cir. 1952). "The avowed purpose of the [second] order was to adopt a formula which would enable each well to currently produce its allowable and ulti-mately produce the amount of gas underlying the lease upon which it was located. The Commission found that one completed well in the formation could adequately and sufficiently drain 640 acres without causing waste ...." *Id.*, 197 F.2d at 648–49. With the above general background in mind, the Court must now interpret the various leases and modifications thereto involved in this litigation.

## III. THE LEASES AND THE CONSOLIDATION AGREEMENT

Since only the royalties from the Panoma-Council Grove well are disputed here, which is located on the SW/4 of Sec. 10, the Court shall restrict its analysis to the leases involving this quarter section and the parties' consolidation agreement. The lessors of this tract are the Coulter defendants and the defendant Texaco, Inc. The significant portions of these instruments shall be summarized below and will receive further analysis in Part IV of this opinion.

### A. *The Coulter Lease*

The Court will first analyze the instruments signed by C. E. Coulter and Della G. Coulter, who, on August 14, 1943, leased their undivided mineral interest in the SW/4 of Sec. 10 to the production company (P.T.O. Ex. 2). The Coulters are the predecessors in interest of the defendants, Steven E. Coulter, Blanche Webb, June Phillips, Harold Coulter, Gilbert Coulter, Edna Mae Peterson, Rita Ann Ubelhart, and Larry E. French (the "Coulter defendants"). Paragraph nine (9) of this lease provided that the lessee production company was expressly granted the right to consolidate the Coulter gas leasehold with adjacent or contiguous gas leasehold estates to form a consolidated leasehold estate not to exceed a total of 640 acres. This paragraph further provided that royalties from gas production payable from a consolidated leasehold estate should be paid to the landowner lessors on a prorated basis depending upon the percentage of acres each lessor had in the consolidated estate. Finally, paragraph

nine (9) of the Coulter lease states that "... a producing gas well on any portion of the consolidated estate shall operate to continue the oil and gas leasehold estate hereby granted so long as gas is produced therefrom."

### B. *The Consolidation Agreement*

On March 21, 1944, the KCC promulgated the Basic Proration Order for the Hugoton Field (P.T.O. Stipulation 4). As mentioned above, this proration order for the Hugoton Field provided for the regulation of production rates from all wells producing from the Hugoton formation. The well producing from the NW/4 of Sec. 15 since 1936 was consequently covered by this order. Approximately three and one-half months after the KCC promulgated the Hugoton Basic Order, the production company, on July 8, 1944, procured the signatures of all the lessor landowners on a consolidation agreement (P.T.O. Ex. 8). Under this agreement four hundred and eighty (480) acres were consolidated, and the production company was given the right to join an additional one hundred and sixty (160) acres into the consolidated area by separate agreements. Paragraph two (2) of this agreement provided that the gas well already then producing from the NW/4 of Sec. 15 would constitute complete development of the entire consolidated area. The production company was expressly not required to drill another gas well or wells upon the consolidated area. In paragraph five (5) of the agreement, the owners of the tract where the existing well was located were provided forty percent (40%) of the royalties from the consolidated unit. This percentage is higher than what these lessors would receive on a prorata basis.

### C. *The Coulter Lease Modifications*

On July 15, 1944, approximately one week before the consolidation agreement was signed, the Coulters and the production company entered into a lease modification agreement (P.T.O. Ex. 9). This agreement provided that the Coulter lease would remain in effect as long as gas, among other items, was produced from the Coulters' quarter section (SW/4 of Sec. 10), or from the tract where the existing well was located. The modification further recited that the Coulter lease was pooled and unitized with the subsisting lease covering the tract where the existing well was located, referred to as the "parent tract."

The original Coulter lease signed August 14, 1943, was modified a second time by agreement on June 4, 1964 (P.T.O. Ex. 9A). This further modification changed paragraph one (1) of the July 15, 1944, lease modification agreement to provide that the Coulter lease would remain in force as long as gas, among other items, was produced from a well located anywhere on the 640 acre gas unit of which the Coulter lease formed a part.

### D. *The Texaco Lease and Modification*

Defendant Texaco was the last party to become involved in the gas production unit. On February 10, 1945, Texaco's predecessor in interest owned and leased to the production company the remaining undivided one-half (½) of the mineral interests in the SW/4 of Sec. 10 (P.T.O. Ex. 10). The Coulters had already leased their undivided half of the mineral interests in this tract to the production company. Texaco's lease was identical in form to the Coulter lease signed August 14, 1943. Consequently, the Texaco lease also provided the production company lessee with the right to consolidate the gas leasehold estate conveyed with adjacent leaseholds to form a gas production unit not exceeding 640 acres. The Texaco lease likewise provided that the lease would continue past the primary ten year term as long as there was a producing gas well on any portion of the consolidated area.

The Texaco lease was modified on January 4, 1946 (P.T.O. Ex. 10A). This instrument is especially relevant for the resolution of this litigation. The intentions of the parties to this modification are set forth on page 1 of the instrument:

WHEREAS, it is the desire of the parties hereto that said oil and gas lease be modified and amended effective as of the

date the State Corporation Commission of the State of Kansas enters an order granting a 640 acre allowable to the gas well heretofore drilled on the Northwest Quarter (NW ¼) of Section Fifteen (15), Township Thirty-four (34) South, Range Thirty-eight (38) West, Stevens County, Kansas, by deleting from lease Number 1 certain provisions therein and substituting other provisions in lieu thereof.

The first modification contained in this instrument provides that the lease would be continued while gas, among other products, is extracted from the Texaco tract or from any of the other 480 acres in the already described gas unit. The modification agreement also specifically established the royalty Texaco would receive under the consolidation. This agreement also reaffirms the incorporation of Texaco's lease into the consolidated unit and pool.

The last significant provision of Texaco's lease modification provided for cancellation of the modification provisions if a regulatory authority in the future reduced the allowable production from the existing gas well on the unit to an amount lower than what would be allowed if the Texaco lease consisted of a full mineral interest in the SW/4 of Sec. 10. In such an event, the production company had the right to terminate the pooling and unitization arrangement.

## IV. LEGAL DISCUSSION

All of the parties request that this Court interpret the various instruments outlined above, and in doing so, the Court will apply Kansas law. The Kansas Supreme Court has stated the following general principles regarding the construction of oil and gas leases:

> [T]he intent of the parties is the primary question; meaning should be ascertained by examining the document from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; reasonable rather than unreasonable interpretations are favored; a practical and equitable construction must be given to

ambiguous terms; and any ambiguities in a lease should be construed in favor of the lessor and against the lessee, since it is the lessee who usually provides the lease form or dictates the terms thereof.

*Jackson v. Farmer*, 225 Kan. 732, 739, 594 P.2d 177 (1979). Here, none of the litigants contend the instruments are ambiguous and consequently this Court shall not refer to any parol evidence to explain or interpret the documents.

The plaintiff production company and most of the defendant landowners argue that the Coulter and Texaco leases, the modifications thereto, and the consolidation agreement, do not specifically limit the effect of the unitization to the Hugoton formation. Consequently, these parties' posture is that the consolidation agreement contained in these instruments goes from the surface of the involved tracts to the center of the earth. The Coulter/Taylor defendants and Texaco, on the other hand, contend that the only reasonable interpretation of the instruments is that the consolidation was agreed to by all the parties for the sole purpose of obtaining the maximum allowable rate of extraction from the well already then producing from the Hugoton formation (the "Hugoton well"). Thus, these parties' position is that the consolidation agreement in existence between the parties does not apply to production from the producing well drilled in 1975 on the SW/4 of Sec. 10, because it produces from the Panoma-Council Grove formation, a horizon below the Hugoton formation.

The parties have not cited any cases from any jurisdiction containing a similar factual situation, nor has the Court's own research produced any helpful precedents. Oil and gas specialists recommend that in drafting unit agreements landowners should take care not to include in the unitization any horizon or formation below the known producing horizon. Cook, *Rights and Remedies of the Lessor and Royalty Owner Under a Unit Operation*, Third Annual Institute on Oil and Gas Law and Taxation, pp. 107–08 (1952). This general principle was discussed by the Tenth Circuit in *Rogers v. Westhoma Oil Co.*, a case originating in Kansas:

The ordinary practice is to confine consolidations to a formation or pool which constitutes a known common source of supply. In situations where there is more than one source or pool underlying the same land a comprehensive consolidation from the surface to the center of the earth carries with it the potential of grievous complications if different geographical units are established for different producing formations.

291 F.2d 726, 730 (1961). A good example of the desired specificity regarding the formation being unitized by agreement can be found in the American Petroleum Institute's Model Form of Unit Agreement, 6 Williams and Myers, Oil and Gas Law § 920.1, p. 143 (1980). This model unit agreement specifically provides for a description of the gas or oil field to be unitized by geologic name, depth, interval or otherwise.

The instruments to be interpreted in the case at bar do not specify with the clarity recommended by the model agreement the extent of the formations covered by the consolidation agreement here. However, this Court is persuaded that given the obvious inter-relationship between the KCC's Hugoton Proration Order and the consolidation agreement, the only reasonable interpretation of the instruments in question is that the parties only intended the Hugoton formation to be controlled by the agreement. Consequently, the Court finds that gas production from the well draining the Panoma-Council Grove formation located on the SW/4 of Sec. 10 is not controlled by the consolidation agreement, and thus royalties from this well are payable only to Texaco and the Coulter defendants.

While interpreting the pertinent instruments, it must be remembered that the parties involved then were without question being motivated by the KCC's promulgation of the Hugoton Proration Order on March 21, 1944. This is clearly indicated by the declaration of the parties' intent contained in the modification of the Texaco lease (P.T.O. Ex. 10A):

WHEREAS, it is the desire of the parties hereto that said oil and gas lease be modified and amended effective as of the date the State Corporation Commission of the State of Kansas enters an order granting a 640 acre allowable to the gas well heretofore drilled on the Northwest Quarter (NW ¼) of Section Fifteen (15), . . . .

Without a consolidation of gas leases held by the production company for the tracts adjacent to the Hugoton well, the rate of production allowed by the KCC would have been reduced.

The consolidation agreement (P.T.O. Ex. 8) dated July 8, 1944, contains language indicating that the parties intended the consolidation to apply only to the Hugoton formation. Paragraph 4 of this instrument provides that an additional 160 acres contiguous to the consolidated area, if "so located as to make it permissible to constitute *a part of the unit for gas proration purposes on which the aforementioned well is located*," could be joined by the production company to the unit to obtain the maximum allowable production. (Emphasis supplied). By providing that an additional quarter section could be added to the unit to obtain a higher allowable rate of production, the parties clearly referred to the KCC proration order for the Hugoton formation that had been issued 3½ months earlier. The above clause also ties the well producing from the Hugoton formation to the unit. Moreover, paragraph two (2) of the consolidation agreement provides that the well already producing from the Hugoton formation constituted full and complete development of the consolidated area for gas production. Finally, paragraph five (5) of the consolidation agreement states what the royalty percentages shall be once a "unit for proration purposes" has been "caused to be attributable to the aforementioned gas producing well," i.e., the Hugoton well. These references clearly indicate an intent to consolidate the leaseholds for production only from the Hugoton horizon.

■ As mentioned above the consolidation agreement provided that the lessors of

the NW/4 of Sec. 15 would receive forty percent of the royalties from the unit. However, as a general rule the lessors of land participating in a unit agreement share in royalties from the unit based upon the number of acres committed by them to the unit. Cook *Rights and Remedies of the Lessor and Royalty Owner Under a Unit Agreement*, Third Annual Institute on Oil and Gas Law and Taxation, p. 111 (1952). However, the owners of the quarter section where the Hugoton well was located received a forty percent (40%) rather than a twenty-five percent (25%) share, which would have been their share on a prorata basis. Although it is unclear why the parties agreed to this arrangement, a possible explanation is that the parties only intended the consolidation would apply to production from the Hugoton formation.

■ The first modification of the Coulter lease also reflects an intent to limit unitization to the Hugoton horizon (P.T.O. Ex. 9). The third provision of this instrument, regarding termination of the modification agreement and the consolidation agreement, ties the lessee's power of termination to the rate of production allowed by the KCC "from the well now located" on the NW/4 of Sec. 15, the Hugoton well. This clause refers to the KCC regulatory authority regarding gas production from the Hugoton formation. More specifically, the parties intended the termination of the unit agreement to be keyed to KCC regulation of gas production from the Hugoton formation.

The second Coulter lease modification, entered into June 4, 1964, was precipitated by technical problems with the well on the NW/4 of Sec. 15 (P.T.O. Ex. 9A). The first provision of this instrument deleted from the first modification the terms continuing the lease so long as gas was produced from either the NW/4 of Sec. 15 or the SW/4 of Sec. 10. In its place the following clause was substituted:

1. This lease shall remain in full force so long as oil, gas, casinghead gas or casinghead gasoline, or any of them, is produced from said land aforesaid, or from the Northwest Quarter (NW/4) of Section Fifteen (15), or the East Half (E/2) of Section Sixteen (16), all in Township 34 South, Range 38 West of the 6th P.M. in Stevens County, Kansas, *and this lease shall remain in force so long as a well located on any land included in the Gas Unit, hereinabove described, is being drilled, re-drilled, worked or re-worked.* (Emphasis supplied)

The above clause gave the production company the flexibility of being authorized to drill a replacement well on the E/2 of Sec. 16 for the failing Hugoton well, and thus anywhere on the 640 acre unit. More significantly, the only "Gas Unit" then in existence was the Hugoton unit. The parties to this instrument thus indicated an intent to continue the Coulter lease so long as there was production from the Hugoton horizon from a well located anywhere on the Hugoton unit.

The Texaco lease modification (P.T.O. Ex. 10A) provides the clearest expression of an intent to limit the consolidation of production to the Hugoton formation. As noted above, the effectiveness of this instrument is keyed to the KCC Basic Order granting a 640 acre allowable to the well then producing from the Hugoton formation. In addition, the third provision of this instrument gave the lessee production company the option to terminate the unit agreement if the allowable rate of production granted by the KCC for the existing Hugoton well was reduced to a specific point for a 20 year period. Clearly the parties would not have tied the continuation of the unit agreement to production from the Hugoton formation had they intended the unit agreement to also control production from the Panoma-Council Grove formation.

In interpreting the above oil and gas instruments, the Court has attempted to look at the four corners of the documents rather than certain isolated provisions. *Tate v. Stanolind Oil & Gas Co.*, 172 Kan. 351, 356, 240 P.2d 465 (1952). As the very able counsel for the plaintiff and defendants owning royalty interests on the E/2 of Sec. 16 and the NW/4 of Sec. 15 have argued, there are

provisions in the above instruments which may not clearly indicate an intent to limit the production unit to the Hugoton formation. The plaintiff Anadarko possessed very good cause for filing an interpleader action and arguing that both producing formations were subject to the consolidation agreement. Nevertheless, "reasonable rather than unreasonable interpretations are favored" in the law. *Jackson v. Farmer*, 225 Kan. 732, 739, 594 P.2d 177 (1979). The Court believes a reasonable interpretation of the documents must take into consideration the purposes behind unitization as outlined above and its background in Kansas as set forth in *Rogers v. Westhoma Oil Co., supra*. After doing so, this Court finds that Texaco and the Coulter and Taylor defendants must prevail here.

IT IS ACCORDINGLY ORDERED that the partial summary judgment motions of defendant Texaco, Inc. and the Coulter and Taylor defendants are hereby granted (Dkt. Nos. 96 and 97). The partial summary judgment motion of plaintiff Anadarko Production Company is consequently denied (Dkt. No. 91).

Township 34 S , Range 38 W , County STEVENS, State _____

SW/4 SEC 10
COULTER - ½
TEXACO - ½

PANOMA COUNCIL GROVE WELL 1975

E/2 SEC.16
BALANCE OF DEF'S.

UW/4 SEC.15
HUFFMAN - ½
CIAPLING - ⅛
SIDWELL - ¼

HUGOTON WELL 1936

HUGOTON UNIT

FORM 45

KANSAS BLUE PRINT CO. INC.

112

## ORDER

It has come to the Court's attention that in its earlier Memorandum and Order dated March 10, 1982, the Court mistakenly states the "Taylor defendants" (Ross E. Taylor and Bertha Taylor) are the successors in interest of C. E. Coulter and Della G. Coulter (p. 6). As reflected by the Pretrial Order, the Taylor defendants are actually the successors in interest of Marie Stout. Consequently, the Court's earlier Memorandum and Order dated March 10, 1982, has been revised to reflect the correct status of these parties, and the Court's revised opinion is attached hereto.

IT IS SO ORDERED this 16th day of March, 1982.