**HOOVER & BRACKEN ENERGIES, INC., Plaintiff-Appellee,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR, et al., Defendants-Appellants.**

No. 82–1074.

United States Court of Appeals, Tenth Circuit.

Dec. 28, 1983.

C. David Stinson, McAfee & Taft, Oklahoma City, Okl. (Gary W. Catron, McAfee & Taft, Oklahoma City, Okl., with him on the brief), for plaintiff-appellee.

Blake Andrew Watson, Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., John E. Green, Acting U.S. Atty., Roger Stuart, Asst. U.S. Atty., Oklahoma City, Okl., Edward J. Shawaker and Laura Frossard, Dept. of Justice, Washington, D.C., on the brief), for defendant-appellant Department of the Interior.

Robert A. Hasty, Jr., Houston, Tex. (Thomas G. Johnson, Houston, Tex., with him on the brief), for amicus curiae Shell Oil Co.

Before SETH, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is an appeal from a district court order which overruled a decision of the Interior Board of Land Appeals (IBLA). The matter presented is that of royalties which are allegedly owed to the government for the production of natural gas on federal and Indian lands. The appellee herein, also

the plaintiff, is a producer of oil and gas and holds interests in several oil and gas leases of federal and Indian lands. These have been communitized with private lands. Leases which were held by Hoover & Bracken require that royalties be paid on a basis of the percentage of the value of the gas produced.

The underlying question is whether these royalties are to be measured based upon what is called the value of the gas produced.

The United States contends that this value includes the severance tax which Oklahoma levies on the land. This amounts to seven percent of the gross value of the production of the natural gas.[1,2] There is also a .085 percent excise tax on the gross value.[3] Both taxes are paid by the purchaser. This is in accordance with the statute. The production from federal and non-Indian lands is exempt from *payment* of the state severance tax under Oklahoma Statute Title 68, §§ 1008, 1106 (Supp.1981).

Hoover & Bracken entered into contracts for the sale of gas produced on the communitized lands at the maximum price allowed by the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301, *et seq.* (NGPA). These contracts provide that the purchaser will pay any state severance taxes. This is commonly known as a tax reimbursement.

Hoover & Bracken has been paying royalties to the government on the federal and Indian lands, using a maximum NGPA price as the value of production. The government, however, felt that the value of production used to compute royalties should be higher—the maximum NGPA price for the gas received by Hoover & Bracken plus the amount of severance tax paid by the purchasers on the communitized lands, i.e., the tax reimbursement.

In 1979 the United States Geological Survey notified Hoover & Bracken that the royalties paid were insufficient as they were calculated only from a percentage of the NGPA price and failed to include the amount of tax reimbursements. Hoover & Bracken appealed this decision to the Acting Director of the USGS, and the Acting Deputy Commissioner of the Bureau of Indian Affairs. Its appeal was denied. Hoover & Bracken then appealed it to the Interior Board of Land Appeals. That body upheld the determination that the amount of tax reimbursements be included in the value of production for the purpose of computing royalty payments. Then Hoover & Bracken brought an action in the Western District of Oklahoma, and was successful in obtaining a reversal of the IBLA decision. In other words, the district court ruled for Hoover & Bracken on a motion for summary judgment.

It is apparent that the matter before us is a question of law. *See First National Bank in Sioux Falls v. National Bank of South Dakota,* 667 F.2d 708 (8th Cir.1981). It is also a policy problem which asks whether the operator shall obtain added profits at the expense of the United States. Although the construction of the statutes and regulations before us is for the courts, it does not follow that the agency interpretation is to be disregarded by a reviewing court. Deference is due the construction of a statute or a regulation of an administrative agency. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Indeed, when an agency is interpreting its own regulations, the courts have given added deference to the agency's construction. The standard of review for an administrative agency's interpretation of its own regulation is that of a plainly erroneous or inconsistent standard. *Devon Corp. v. Federal Energy Regulatory Commission,* 662 F.2d 698 (10th Cir.1981), and *Morrison and Morrison, Inc. v. Secretary of Labor,* 626 F.2d 771 (10th Cir.1980). We consider

---

**1.** The leases for the non-Indian federal lands provide that a royalty of 12½% on production shall be computed according to the provisions of 30 C.F.R. 221.47. The leases of the Indian lands provide for a royalty of 16⅔% of the value of the natural gas produced.

**2.** Okla.Stat.Tit. 68, § 1001(b) (Supp.1981).

**3.** Okla.Stat.Tit. 68, § 1102 (Supp.1981).

the decisions below upon the basis mentioned.

■ First, the IBLA ruling was that the value of production for the purpose of determining the royalties owed on the federal and Indian lands included the price received for the gas by the gas producer plus the amount of state severance tax paid by the purchaser. IBLA relied on its prior decision in *Wheless Drilling Co.,* 13 IBLA 21, 80 I.D. 599 (1973). The facts and issues in *Wheless* are pretty much the same as those present here. Federal and private lands had there been communitized. State severance taxes were paid only on the non-federal portion. The issue was the amount of royalties owed to the government, as here. The gas producer in *Wheless* argued that the figure to be used to calculate royalties was the field price set by the Federal Power Commission pursuant to the Natural Gas Act, 15 U.S.C. § 717, *et seq.* (1970). The government, however, maintained that the figure to be used was the field price plus the amount of tax reimbursement. The IBLA so ruled. It said:

> It seems obvious to us that the buyer is thus paying to the seller an amount greater than the established field price for the natural gas it purchases from the # 1 T.L. James well. It follows, therefore, that it is reasonable to compute the Federal royalty of the natural gas taken from this well on a unit value consisting of the field price established by the FPC plus the amount of the severance tax reimbursed by the buyer.

*Wheless,* 13 IBLA 21, 80 I.D. at 603.

IBLA noted that absent any reimbursements for state severance taxes on production on communitized lands, the FPC ceiling price would be the proper figure to use to compute royalties.

The IBLA, as in *Wheless,* interpreted 30 C.F.R. 221.47.[4] The IBLA reiterated its interpretation of the term "gross proceeds" as it is contained in 30 C.F.R. § 221.47 as "the established price for the natural gas plus any additional sums paid by the purchaser of the gas to the unit operator as consideration for the purchase of gas from the unit of which the federal lease is a part." The IBLA also found that notwithstanding its decision in *Wheless,* it would come to the same conclusion here. The *Wheless* case focused on the definition of gross proceeds in 30 C.F.R. § 221.47. In the case at bar the IBLA proceeded to analyze the question in terms of the definition of "reasonable value" in the same regulation. It held that the value of production was not necessarily synonymous with gross proceeds, which is the amount the producer received for the gas. Indeed, there are suggestions in some of the opinions that value is not necessarily the same as price. *Domatti v. Exxon Corporation,* 494 F.Supp. 306, 314 (W.D.La.1980), and *Agurs v. Amoco Production Co.,* 480 F.Supp. 737 (W.D.La. 1979) (existence of a federal regulation fixing a maximum rate is absolutely no obstacle to the fixing of a higher rate as the market value of gas for the purpose of computing royalties).

The plaintiff-appellee appears to rely on *Bowers v. Phillips Petroleum,* 692 F.2d 1015 (5th Cir.1982) as being controlling on the question as to whether the value of production may exceed the maximum ceiling price. On the facts presented in that case the value of production could not exceed the NGPA ceiling price. This case is different

---

**4.** The regulation just cited provides as follows: The value of production, for the purpose of computing royalty shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters. Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary. In the absence of good reason to the contrary, value computed on the basis of the highest price per barrel, thousand cubic feet, or gallon paid or offered at the time of production in a fair and open market for the major portion of like-quality oil, gas, or other products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value.

on its facts and does not address the question of state severance taxes or the specific statutory treatment of state severance tax in relation to the set maximum prices.

It is important to note that the IBLA stated that the clear language of the regulation specified that all relevant matters shown be considered in determining the estimated reasonable value. The value of production is based on the estimated reasonable value. One relevant factor was § 3320(a) of the NGPA which provides:

(a) Allowance for State severance taxes and certain production-related costs.— Except as provided in subsection (b) of this section, a price for the first sale of natural gas shall not be considered to exceed the maximum lawful price applicable to the first sale of such natural gas under this part if such first sale price exceeds the maximum lawful price to the extent necessary to recover—

(1) State severance taxes attributable to the production of such natural gas and borne by the seller, but only to the extent the amount of such taxes does not exceed the limitation of subsection (b) * * *

The IBLA thought that it was relevant to consider the reimbursement of the state severance tax. Although this section of the NGPA specifies that the exception applies when state severance taxes are borne by the seller and Oklahoma requires them to be paid by the purchaser, the IBLA reasoned that in this case, the economic result was the same. The IBLA noted that Hoover & Bracken received the ceiling amount because the actual price to the purchaser was the ceiling amount plus the amount of taxes. Accordingly, the IBLA found that the reasonable value exceeded the gross proceeds.

The IBLA also cited a policy reason. It considered to whom the benefit of the federal government's sovereign immunity should flow:

The fact that the United States cannot be assessed state insurance tax does not depreciate the *value* of the gas to it. Immunity from state taxation is a function of the Federal Government's sovereignty, which prevents the state from assessing a severance tax. This benefit flows to the Government, not the lessor. *Hoover & Bracken Energies, Inc.,* 52 IBLA 27, 37.

The district court ruled in favor of Hoover & Bracken. Thus, it is reversed. The district court was of the opinion that *Wheless* was not controlling based on the post-*Wheless* changes in the federal regulations of the gas market. At the time *Wheless* was decided in 1973, there were two gas markets, the regulated interstate market, and the unregulated intrastate market. The NGPA of 1978, however, sets uniform ceiling prices nationwide. *Wheless* was considered to be inapplicable based on this change. The district court failed to explain why it felt that this change in the federal regulation of the gas market led to its conclusion that *Wheless* was inapplicable. The United States Supreme Court noted that the purpose of the NGPA was to "alleviate the adverse economic effects of the disparate treatment of intrastate and interstate natural gas sales." *Maryland v. Louisiana,* 451 U.S. 725, 747 at n. 22, 101 S.Ct. 2114, 2129 at n. 22, 68 L.Ed.2d 576 (1981). The district court did take note of the fact that under the NGPA the seller is entitled to receive up to the maximum ceiling price regardless of whether a state imposes severance taxes on the seller or the buyer. *Wheless* does not appear to effect the above quoted purpose of the NGPA. Furthermore, under *Wheless,* a seller still can receive up to the maximum NGPA; *Wheless* only effects the amount of royalties a producer must pay if a tax reimbursement scheme is present.

There is no reason why the enactment of the NGPA should effect the force of the *Wheless* decision. While *Wheless* does not necessarily control this situation, it is, nevertheless, entitled to deference. This is particularly so in view of its basic fairness and its having been in effect for ten years, and has presumably been relied on by gas producers and lessors in their private law making. This established system for computing royalties for communitized lands that in-

clude federal acreage should not be overruled lightly. The reason given by the district court does not justify reversal of a well-reasoned opinion of an administrative agency. Absent a convincing reason to decide otherwise, this case should follow *Wheless.*

As we have indicated, the district court, after having commented on *Wheless,* then reversed the IBLA based on the court's interpretation of § 3320(a) of the NGPA. As set out above this section of the statute allows the ceiling price to be exceeded to the extent necessary to recover state severance taxes attributable to the production of such gas when the taxes are borne by the other. We see no basis for abandoning *Wheless* after ten years.

The district court considers it unlawful to value the production above the ceiling price when the gas attributable to the federal and Indian lands was not subject to any state severance tax. This fails to consider the dispositive fact that the lands at issue are communitized. It is readily apparent that communitized land cannot be readily changed from being communitized for one purpose and then segregated because it results in lower royalty payments. To adopt the interpretation of the district court it would have this effect.[5]

The general rule for royalty payments when a communitization agreement is in effect is that the "lessors of land participating in a unit agreement share in royalties from the *unit* based upon the number of acres committed to them by the unit." *Anadarko Production Co. v. Taylor,* 535 F.Supp. 103, 110 (D.Kan.1982) (emphasis added), citing Cook, *Rights and Remedies of the Lessor and Royalty Owner Under a Unit Agreement,* Third Annual Institute on

Oil and Gas Law and Taxation, p. 111 (1952).

To prohibit the value of production in royalty calculations from including tax reimbursements because no state severance tax is attributable to the federal and Indian lands violates the general rule. Furthermore, it is readily apparent that the lands cannot at the same time be communitized and segregated. Appellee is not entitled to have it both ways. Presumably it has received benefits from the communitization agreements. It cannot now, merely because it would be to its economic advantage, treat the lands as if they were not communitized. The IBLA, in *Wheless,* rejected the gas producers' attempt to segregate communitized lands when the time came to compute royalties. Undoubtedly this is the correct position and the court ought not to allow communitized lands to be segregated for the mere purpose of computing royalties. To do so also deprives the federal government of funds to which it is entitled. And also, it affects the Indians.

In the final analysis, the problem boils down to the following. First, the value of production is basic for payment of royalties. Second, the gas is sold to a buyer. Third, the maximum price allowed by law includes the severance tax. Oklahoma has its tax, but federal lands are exempt from it. Fourth, the buyer pays it. The seller has received the contract price, plus severance tax. The gas producer says, in effect, "we only owe royalties on the contract price received. Our lease says value of production. What is the value of production? Is it contract price, or contract price, plus severance?" The latter is the value of production for payment of royalties.

---

5. The parties here agree to the statement of facts as follows:

These federal Indian lands have been communitized with privately-owned lands. Under these communitization agreements all land included within one dwelling and spacing unit, as established by the Oklahoma Corporation Commission (in Western Oklahoma such a unit is usually 640 acres) is developed as though the land were all under one lease, although in fact the land may be owned by many different lessors and leased to many different lessees.

Communitization allows production from one well within the unit to constitute production from each lease within the unit, thereby preserving each lease. Costs are borne by each lessee according to what percentage of the total acreage in the unit he or she has leased and production from the unit is allocated to each lessee and royalty owner in accordance with each lease's term. Brief for Appellants at p. 4. This statement was agreed to by Appellees, in Brief for Appellees at p. 2.

One more thing: It is apparent that *Wheless* is a persuasive authority. While it does not control this court's decision, the decision so made has been in effect for ten years and has been utilized by lessees and lessors for the past ten years. The enactment of the NGPA does not affect the soundness of the reasoning present in *Wheless.*

Accordingly, the case should be decided in accord with *Wheless,* unless there is some good reason to depart from it. The construction given to § 3320(a) of the NGPA by the district court would negate the communitization agreement, and would cause confusion in this body of law. We are not moved to abandon *Wheless* under the circumstances presented.

For the reasons stated, then, the judgment of the district court must be reversed and at the same time, the judgment of the Department must be affirmed.

Accordingly, the judgment of the district court is reversed and the cause is remanded for further proceedings.

SETH, Chief Judge, dissenting:

I must dissent from the majority opinion because, in my view, it permits the Department of Interior to adopt practices contrary to the Natural Gas Policy Act (15 U.S.C. § 3301). I would affirm the judgment of the trial court.

Classifications and ceiling prices under the NGPA were constructed by Congress to encourage production of natural gas. It adopted the incentive theory of pricing, and abandoned the cost basis typical of utility rate regulation. Dual markets were eliminated as well.

With this incentive pricing express provisions were included to insure that the producer received the ceiling price not reduced by severance taxes. This was fully and carefully considered by Congress. It was a significant element in the legislation.

It was understood that under the Act the severance taxes would be passed on to the consumers. Congress thus balanced the considerations among the lessors, lessees, purchasers and the public. This fixed the public policy considerations beyond changes by administrative agencies. *See Kerr-*

*McGee Corp. v. Northern Utilities, Inc.,* 673 F.2d 323 (10th Cir.1982). Congress also set price ceilings and classifications beyond the authority of administrative agencies. The Act thus made fundamental changes in the theory of pricing, the method of pricing, the handling of severance taxes, and the allocation of authority. The Act thereby impacted Interior's formula for royalty calculations.

The Act expressly provided for a treatment of severance taxes and tax reimbursement. This had been an element sought to be used by Interior in its "gross proceeds" concept. The Act also provided that the Commission could allow adjustments for certain production-related costs which had previously gone into Interior's "gross proceeds." Interior's use of those elements was thus changed by Congress itself. These substantial changes rendered Interior's reliance on its "gross proceeds" untenable. This seems to be demonstrated by the opinion here on appeal where the shift was made away from "gross proceeds," a change to an undefined "value" theory which apparently does not appear in any regulations, letters or memoranda of Interior.

Furthermore the sole basis for the *Wheless* departmental opinion has thus disappeared. A new theory is sought to be substituted. As mentioned, the opinion from which this appeal is taken expresses a departure from *Wheless* and only lip service is given to it. The author of the *Wheless* opinion concurred in the opinion appealed from.

Interior is nevertheless trying to hold on to a position which cannot be reconciled with the NGPA. The consequence is that one agency of Government is seeking to bring about a result contrary to that of another. The intention of Congress in the NGPA is perfectly clear on the point and no room is left for agency action seeking a contrary result or seeking to justify its position on its own concept of "public policy." Congress has resolved the public policy considerations and the issue itself. If Interior prevails in its position, contrary to the NGPA, the producer will have received less

than the ceiling price, this by reason of Interior's treatment of severance taxes, an element specifically considered and provided for by Congress.

Interior seeks to increase its royalty amount over the others unfairly by starting with what it refers to as a "value" figure which is in excess of the ceiling price for gas provided by Congress. There is no basis in the NGPA for a separate category for pricing Government royalty gas at a figure different from other gas in the classification. The Government seeks for royalty computation to add to the ceiling price the amount of the severance tax. This it cannot do. The ceiling price *plus the tax* have no relation to "value". The tax is supposed to be paid, and is paid, according to the state tax statute, by the purchaser. There is no added money going to the producer for the severance tax. There is no such "amount received" by the producer. There is, again, no relation to "value". It is in substance the same as if the Government royalty gas had been sold above the ceiling price contrary to the NGPA.

Again, there is no place in the Congressionally mandated classifications in the NGPA for the separate price category here sought by Interior above the ceiling prices. There is no authority in the administrative agency to create such a classification in an attempt to construct some "value" theory.

Thus it must be concluded that the position of Interior here advanced as to severance taxes is to administratively override the express provisions in the NGPA which do not permit the application of severances taxes to eliminate the right of the producer to the incentive ceiling price. Interior cannot for these or any other purpose create its own price classification.

The arguments advanced by both sides have no impact whatever on the communitization agreement or the unit. We are only concerned with mathematical computations applied to the unit production. There are already distinctions among the tracts because the royalty percentages are different, and by reason of the severance tax exempt status of some production.

The trial court took all these factors into consideration, reached the correct result, and should be affirmed.