**SUPERIOR SOFT WATER COMPANY, Petitioner,**

v.

**UTAH STATE TAX COMMISSION, Respondent.**

**No. 920337–CA.**

Court of Appeals of Utah.

Nov. 30, 1992.

---

Lynn P. Heward and Delwin T. Pond, Salt Lake City, for petitioner.

R. Paul Van Dam and Susan L. Barnum, Salt Lake City, for respondent.

Before BENCH, JACKSON and ORME, JJ.

## OPINION

JACKSON, Judge:

Superior Soft Water Company (Superior) appeals a final decision by the Utah State Tax Commission (Tax Commission) upholding the assessment of a sales tax on Superior's sales of leased water softeners. We reverse.

## FACTS

Superior was in the water softener business from approximately 1956 to 1970 under the name of Superior Sales and Service.[1] Superior purchased materials from a vendor and assembled, customized, and attached these materials to the particular plumbing of the customer's home. Installation on the premises of a customer was done pursuant to a sales and installation contract, lease, or rental agreement. The rentals and leases were part of a marketing strategy to place water softeners in homes. This strategy apparently helped overcome the initial reaction of customers who often remarked that the softened water feels "slippery" or "slimy." After using softened water for a time, customers then "realize[d] that their skin [felt] better, softer, smoother, nicer than it did before," and often purchased the water softener. The whole idea of renting or leasing a water softener to a customer was to convert the rental or lease agreement into a sale.

When Superior first started doing business, it charged a sales tax to the customer on every sale of a water softener and remitted that tax to the Tax Commission. It later heard from a competitor that it did not need to charge tax on sales of water softeners. Superior contacted the Tax Commission to verify this information. It was informed it did not have to charge the tax because the sale was of real property. Subsequent to a sales tax audit, Superior petitioned the Tax Commission for a hearing to determine if it could recover the erroneously charged and remitted taxes. During both the audit and the hearing, the Tax Commission was aware of Superior's post-lease sales. The Tax Commission never distinguished the tax consequences of selling a water softener outright from selling a water softener during or after a lease. Superior left the water softener business around 1970.

In 1985, Superior re-entered the business. Before commencing operations, one

---

1. Superior's water softeners were not pre-assembled units to be plugged in by the customer. They were unassembled materials and components that Superior brought to the home of the customer and assembled around the particular plumbing of each customer's home.

of Superior's owners contacted the Tax Commission to reconfirm his understanding of how sales and use taxes applied to the sale and lease of water softeners. He was informed that water softeners become fixtures when attached to real property, and because of this, they are essentially part of the real property and not subject to sales tax. Instead, a use tax would be imposed on the cost of materials used in the construction of the water softener unit. This information was consistent with Superior's prior practice and understanding. Superior's accountant individually contacted the Tax Commission and was told the same thing.

Superior again transacted business with its customers by leasing water softeners, selling them on a furnish and install contract, and selling them during or at the end of lease agreements. For water softeners that were first leased and then converted into sales, Superior collected and remitted sales tax on the lease payments received. Later, if the lessee exercised the option to convert the lease to a purchase, Superior paid use tax on the cost of the materials used and attached to the real property. Superior did not charge or pay a sales tax on the post-lease sale of the water softener.

The Auditing Division of the Tax Commission conducted a sales and use tax audit on Superior during the period of January 1, 1985 through December 31, 1986. It assessed a sales tax on all water softeners sold subsequent to lease agreements. This prompted Superior to file for a redetermination. An informal hearing was held before the Tax Commission on January 6, 1988. The Tax Commission's findings stated in pertinent part:

> Water softeners which are first leased to a customer and then sold to that customer are subject to tax on the monthly rental payments for the duration of the lease, and are subject to sales and use tax on the residual sales price of the later sale of the water softener to that customer. Separate transactions will

have occurred. There is no double taxation.

The Decision and Order read as follows:

> Based on the foregoing, it is the Decision and Order of the Utah State Tax Commission that water softeners which are sold outright to the customer and installed become part of the realty. Water softeners which are leased to a customer remain personal property. Water softeners which are first leased and then sold to a customer become part of the realty at the time of the sale.

Superior interpreted the Decision and Order according to its understanding of what the Tax Commission had previously told it: water softeners sold after leases become fixtures and are not subject to sales tax. The Tax Commission took the position expressed in the findings to conclude Superior should have charged and remitted sales tax on post-lease sales of water softeners.

Still unclear on how it should proceed, Superior's accountant wrote to the Tax Commission for clarification and received a letter from James E. Harward, a Tax Commission Hearing Officer. In his letter, Mr. Harward stated that "[t]he sale of a soft water unit to a customer after a lease has expired is also a taxable transaction. The price paid, typically the residual value of the water softener at the conclusion of the lease, should have tax computed and charged thereon."

Superior wrote to the Tax Commission for further clarification and received another letter from Mr. Harward stating in pertinent part:

> I would like to further expound ... to indicate that when the water softener is sold and installed by you, you're classified as a real property contractor and the end consumer, therefore, you should be paying use tax on your cost of the water softener because you are installing the water softener on real property.

Because these letters were in apparent conflict, Superior filed a motion for Reconsideration and Clarification of Informal Decision. The Tax Commission at the Clarification Hearing found Superior should have charged a sales tax on the post-lease sales

of its water softeners, and that it was liable to the Tax Commission for the uncollected taxes. Superior petitioned for a formal hearing before the Tax Commission which made similar findings.

The Supreme Court granted Superior's writ of review. The matter is now before us pursuant to a Supreme Court transfer.

## ISSUE

The Tax Commission relies on the Utah Sales and Use Tax Act[2] (the Tax Act) which provides in pertinent part:

(1) There is levied a tax on the purchaser for the amount paid or charged for the following:

(a) retail sales of tangible personal property made within the state;

. . . . .

(k) leases and rentals of tangible personal property if the property situs is in this state, if the lessee took possession in this state, or if the property is stored, used, or otherwise consumed in this state;

. . . .

Utah Code Ann. § 59–12–103(1)(a) and (k) (1987). The Tax Act, however, also defines "tangible personal property" as not including "real estate or any interest therein or improvements thereon...." Utah Code Ann. § 59–12–102(13)(b)(i) (1987).[3]

The Tax Commission concedes in its brief that the sale of a water softener pursuant to a sales and installation contract is considered a sale of real property, not tangible personal property. In its informal decision of May 5, 1988, the Tax Commission noted that "[w]ater softeners which are sold and installed become part of the realty...." Stated in terms of the Tax Act, the sale of water softeners, sold pursuant to sales and installation contracts, are sales of improvements to real estate, and not sales of tangible personal property subject to sales tax.

2. Utah Code Ann. § 59–12–101 to –302.

3. It should be noted that the Tax Commission's reliance on the 1987 version of the Utah Sales and Use Tax Act is improper. The 1986 version of the Act is controlling in this case. The 1986 Act also levied a tax upon the retail sale of tangible personal property, but did not define "tangible personal property." The term was,

The issue thus becomes whether a lease agreement, prior to the sale of an improvement to real estate, changes the nature of the improvement so that it becomes taxable as a sale of tangible personal property under § 59–12–103(1)(a).

## STANDARD OF REVIEW

Because this action was commenced before the effective date of the Utah Administrative Procedures Act (UAPA), Utah Code Ann. §§ 63–46b–1 to –22 (1989), we do not apply that statute. The Supreme Court, in *Morton Int'l, Inc. v. Auditing Div.*, 814 P.2d 581 (Utah 1991), set forth the different standards of review for agency actions prior to UAPA. First, agencies' findings of fact were given considerable deference and would not be disturbed on appeal if supported by substantial evidence. *Id.* at 585; *Dept. of Admin. Serv. v. Pub. Servs. Comm'n*, 658 P.2d 601, 608–09 (Utah 1983). Second, rulings concerning general law were given no deference and could be overruled using a correction-of-error standard. *Id.* Finally, an intermediate standard of review, "granting some deference to the agency's decisions, has been used when the agency's experience or expertise puts the agency in a better position to resolve issues concerning the application of findings of fact to the legal rules governing the case." *Morton*, 814 P.2d at 586; *accord Admin. Servs.*, 658 P.2d at 610. This standard has also been applied when interpreting "the operative provisions of the statutes the agency is empowered to administer." *Id.*

The most recent review of a tax commission ruling using a pre-UAPA standard came in the case of *Chicago Bridge & Iron Co. v. State Tax Comm'n*, 839 P.2d 303 (1992). The *Chicago* court used the inter-

however, defined in the Utah Sales and Use Tax Acts and Regulations as not including "real estate or any interest therein or improvements thereon...." *Mark O. Haroldsen, Inc. v. State Tax Comm'n*, 805 P.2d 176, 178 (Utah 1990) (quoting Tax Regulation A12–02–S26 (1977)). Under either statute, no sales tax should be levied on improvements to real property.

mediate "reasonableness" standard to determine that the subject matter of a sale was real property, not tangible personal property. *Id.* at 306–307. In the case before us, the Tax Commission's application of a tax rule to the facts was in essence an interpretation of the tax rule. The pre-UAPA intermediate standard applies to both applications of law to fact and interpretations of provisions that agencies are empowered to administer.

### ANALYSIS

We hold the Tax Commission's distinction between direct sales of water softeners and post-lease sales of water softeners to be unreasonable. We see no rational distinction between the two.

The Tax Commission relies on section R865–19–51S(c) of the Utah Administrative Code (section 51) to support its argument that post-lease sales of water softeners are taxable as tangible personal property. Section 51 states in part that "[t]angible personal property which is attached to real property, but remains personal property, is subject to sales tax on the retail selling price of the personal property." Utah Code Admin.P. R865–19–51S(c) (1986). The Tax Commission argues without support that water softeners remain tangible personal property during the period of a lease. It argues that the status of a water softener does not change until the moment of the sale, making the post-lease sale of water softeners taxable as tangible personal property. By applying section 51 in this manner, the Tax Commission is necessarily inferring that under section 51, tax assessments are based on the form and timing of the sale. This inference is beyond the clear import of the language used and out of harmony with Utah tax statutes, regulations, and case law.

When interpreting statutes levying taxes, "it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out." *Gould v. Gould*, 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917). The Utah

Supreme Court cites *Gould* with approval concluding "tax statutes are to be construed strictly, and in favor of the taxpayer where doubtful." *Pacific Intermountain Express Co. v. State Tax Comm'n,* 8 Utah 2d 144, 329 P.2d 650, 651 (1958) (footnote omitted). The Tax Commission did not construe section 51 strictly. It assessed a sales tax based on its inference that the time of sale of an improvement was somehow relevant to whether the improvement remained personal property instead of becoming real property.

■ A statutory provision must be construed "so as to make it harmonious with other statutes relevant to the subject matter." *Stahl v. Utah Transit Auth.,* 618 P.2d 480, 481 (Utah 1980). The Utah Supreme Court has held that "administrative interpretation out of harmony and contrary to the express provisions of a statute cannot be given weight and, to do so, would in effect amend that statute." *Olson Construction Co. v. State Tax Comm'n,* 12 Utah 2d 42, 43, 361 P.2d 1112, 1113 (1961) (footnote omitted). The Tax Commission's interpretation of section 51 bases the assessment of sales tax on the form and timing of the financing arrangement accompanying the sale, not on the subject matter of the sale. This is out of harmony not only with existing tax regulations, but also with prior case law.

An improvement is actually the end result of a process converting tangible personal property into real estate. The rationale for not taxing the sale of this "end result" is made clear by section R865–19–58S(a) of the Utah Rules of Administrative Procedure (section 58). This Tax Commission rule states in pertinent part:

> Tangible personal property sold to real property contractors ... is generally subject to tax. The person who converts the personal property into real property is considered to be the consumer of the personal property since he is the last one to own it as personal property. The contractor ... is deemed to be the consumer of tangible personal property used to improve ... real property regardless of the type of contract entered into.... The

sale of real property is not subject to the tax. . . .

Utah Code Admin.P. R865–19–58S(a) (1986). Section 58 clearly implies that the rationale for not taxing the sale of improvements to real estate is based on the policy of taxing the final consumer of the personal property, the one who converts the personal property into real property.[4] This section suggests the determination of a tax assessment should be based on the physical process of conversion, not on how the conversion is financed.

The Utah Supreme Court also suggests such a basis. *See Utah Concrete Products Corp. v. State Tax Comm'n*, 101 Utah 513, 125 P.2d 408, 409–10 (1942); *See also Chicago Bridge & Iron Co. v. State Tax Comm'n*, 839 P.2d 303, 306–307 (Utah 1992). In *Utah Concrete*, the court stated the paramount question in deciding whether to tax the sale of building materials from a vendor to some contractors was whether the contractors were " 'consumers' within the meaning of the act or whether they were mere dealers in the products reselling to the third parties." *Utah Concrete*, 125 P.2d at 410. If the contractors simply resold the material, then they were not consumers and did not have to pay a sales tax on the purchase from the vendor. Instead, the contractors would pass the sales tax on to the customer buying the materials. *Id.* at 409–10. The court, in deciding the contractors should pay the sales tax, reasoned the contractors purchased materials "for the purpose of using and consuming them by incorporating them . . . not for reselling them as such in their original form, but for the purpose of changing their very nature from personal to real property." *Id.* at 410. The court noted that "labor and many other materials enter along with the plaintiff's products to make up the particular structure, and they are all used or consumed in the process of producing a new entity." *Id.*

Superior, like the contractors in *Utah Concrete*, is a real estate contractor. The sale of materials by the vendor to Superior is taxable under section 58. With the inseparable commingling of labor, materials and real estate, Superior converts these materials into real property. The tangible personal property in the form of materials is consumed to make the water softener. Superior is the final consumer. The Tax Commission has failed to show how the form of financing the sale has any bearing on the rationale or policy of taxing the final consumer.

Section 58 and *Utah Concrete* clearly support the fact that the form and timing of the financing arrangement are irrelevant to the rationale of exempting the sale of improvements from sales tax. The Tax Commission's application of section 51 to the facts of this case necessarily leads to the erroneous conclusion that a tax assessment should be based on the time of sale. This court will not give effect to such an interpretation by applying section 51 to Superior's post-lease sale of water softeners. The Tax Commission has held direct sales of water softeners to be exempt from sales tax as sales of improvements to real property. We find that a lease agreement prior to a sale does not change the rationale or policy behind exempting the sale of a water softener under either the Sales and Use Tax Act or the Tax Commission's own rules.

## CONCLUSION

Under existing statutes and regulations, and in light of the Tax Commission's own holding, we conclude that the Tax Commission's application of section 51 to Superior's post-lease sales of water softeners was improper. The nature of an improvement does not change simply because it is sold subsequent to its initial installation under a lease. We therefore hold the Tax Commission's ruling assessing sales tax on Superi-

---

4. This policy of levying sales tax only on sales for final consumption has been advocated by economists for many years. Jack C. Davis, *The Purposive Approach to the Interpretation of Sales Tax Statutes,* 27 Ohio St.L.J. 429, 437–38 (1966)

(retail sales tax is theoretically a consumption tax which requires the tax burden to be distributed in proportion to final consumption expenditures).

531

or's post-lease sales of water softeners to be unreasonable.

Superior's claim for attorney fees under 42 U.S.C. § 1988 (1982) is without merit and is accordingly denied.

Reversed.

BENCH and ORME, JJ., concur.

