BELNORTH PETROLEUM CORPO-
RATION (Enron Oil & Gas
Company), Petitioner,

v.

STATE TAX COMMISSION
OF UTAH, Respondent.

No. 920545–CA.

Court of Appeals of Utah.

Jan. 12, 1993.

A. John Davis, Pruitt, Gushee & Bachtell, Salt Lake City, and Dante L. Zarlengo (argued), Denver, CO, for petitioner.

Jan Graham, Atty. Gen., and Brian L. Tarbet (argued), Asst. Atty. Gen., Salt Lake City, for respondent.

Before BENCH, GARFF and RUSSON, JJ.

## OPINION

BENCH, Judge:

Petitioner, Belnorth Petroleum Corporation (Enron Oil & Gas Co.) (hereafter "Enron") seeks review of a ruling by the State Tax Commission. The Commission held that Enron paid insufficient occupation and conservation taxes on the natural gas it produced between 1980 and 1984. We reverse.

## BACKGROUND

Enron is one of the largest producers of natural gas in Utah. From 1980 to 1984, Enron sold natural gas pursuant to several contracts that required the purchasers to reimburse Enron (in whole or in part) for ad valorem taxes paid by Enron to the State. In addition to paying ad valorem taxes, Enron was required to pay an occupation tax on the "value at the well" of the gas it produced.[1] The applicable statute, Utah Code Ann. § 59–5–67 (1953 as amended 1983),[2] provides, with our emphasis, as follows:

(1) Except as otherwise specifically provided in this article, every person engaged in the business of mining or extracting metalliferous minerals in this state shall pay to the state an occupation tax equal to one percent of the gross amount received for or the gross value of metalliferous minerals sold, or in the case of uranium and other fissionable materials, delivered, as defined in subsection 59–5–56(1)(k); and every person owning an interest (working interest, royalty interest, payments, out of production or any other interest) in oil, gas, or other hydrocarbon substances, (except solid hydrocarbons), produced from a well or wells in the state, or in the proceeds of such production, *shall pay to the state an occupation tax equal to two per cent of the value at the well of the oil, gas and other hydrocarbon substances produced, saved, and sold or transported from the field where produced....*

(2) The basis for computing the occupation tax imposed by this article for any year shall be as follows:

. . . .

(b)(i) In the case of oil, gas, or other hydrocarbon substances, (except solid hydrocarbons) *the value at the well shall*

---

1. The occupation tax is a license tax on the privilege of exacting and producing natural resources, such as natural gas, based upon the amount produced. *Phillips Petroleum Co. v. State Tax Comm'n,* 13 Utah 2d 287, 289, 373 P.2d 388, 389 (1962).

2. Section 59–5–67 has since been repealed, recodified, and amended. *See* Utah Code Ann. § 59–5–103 (1992).

*be the value established under a bona fide contract for the purchase of the same* or in the absence of a contract by the value of the well established by the United States for royalty purposes in the field from which they are produced.

Enron calculated and paid its occupation taxes based on the contract price specified for each unit of gas produced. It did not pay any occupation taxes on the amounts it received as reimbursements for the ad valorem taxes it paid to the State.

The Auditing Division of the Commission issued Enron a Notice of Deficiency because Enron did not pay occupation taxes on the ad valorem tax reimbursements it received in the years 1980 through 1984. The Division assessed Enron an additional $72,989.87. The Division considered the ad valorem tax reimbursements to be part of the value of the gas Enron produced, and therefore subject to the occupation tax.

Enron paid the assessment under protest and filed a petition for redetermination with the Commission. The Commission conducted a hearing and held that ad valorem tax reimbursements were subject to the occupation tax. Enron petitioned the Utah Supreme Court to review the Commission's ruling. The supreme court transferred the petition to this court.

The issue on appeal is whether reimbursements of ad valorem taxes received by Enron should be considered part of the "value at the well" of the natural gas produced by Enron. We hold that ad valorem tax reimbursements are not part of the "value at the well" of natural gas and therefore should not have been included in calculating Enron's occupation taxes.[3]

## STANDARD OF REVIEW

At issue in this case is the Commission's statutory interpretation of "value at the well" found in section 59–5–67(2)(b)(i). Under Utah Code Ann. § 63–46b–16(4)(d), we may grant relief from agency action if "the agency has erroneously interpreted or applied the law."[4] We do not defer to an agency's statutory interpretation unless the legislature has explicitly, or implicitly, granted the agency discretion to interpret the statutory language at issue. *Morton Int'l, Inc. v. State Tax Commission*, 814 P.2d 581, 588–89 (Utah 1991).

There is no explicit statutory grant of discretion to the Commission to interpret the phrase "value at the well." *See Bhatia v. Department of Employment Sec.*, 834 P.2d 574, 581 and n. 3 (Utah App.1992) (Bench, P.J., concurring) (an explicit grant of discretion occurs when the legislature directs the agency to interpret a given statutory term by rule). Nor is there an implicit grant of discretion because any question as to the legislature's intent can be resolved by resort to traditional rules of statutory construction. *Morton*, 814 P.2d at 589; *see also Ferro v. Department of Commerce*, 828 P.2d 507, 510–11 (Utah App.1992) (explaining implicit grants of discretion). We therefore review the Commission's interpretation of "value at the well" under a correction-of-error standard.[5]

---

3. We are also called upon to determine the appropriate basis for calculating conservation taxes levied under Utah Code Ann. § 40–6–14 (1988). The parties have not treated the statutes as different, nor identified how much, if any, of the $72,989.87 deficiency was attributable to conservation taxes. Even though there are differences in the language of the two statutes, both taxes are based upon the "value at the well." We therefore see no difference in analysis. Consequently, our holding with regard to Enron's occupation tax liability is equally applicable to Enron's conservation tax liability.

4. In order to grant relief, we must also find that the petitioner has been substantially prejudiced by the agency's action. Utah Code Ann. § 63–46b–16(4) (1989). It is clear that the Commis-

sion's erroneous interpretation substantially prejudiced Enron because Enron was required to pay an additional $72,989.87 in taxes based on that interpretation.

5. This court recently noted in determining the standard of review in a Tax Commission case that the Commission has been granted authority to administer the tax code. *See Putvin v. State Tax Comm'n*, 837 P.2d 589, 590 (Utah App.1992) (quoting Utah Code Ann. § 59–12–118 (1992)). An administrative grant to administer a statute should not be confused with a grant of discretion to interpret the statute since that would prematurely terminate our standard of review analysis under *Morton*. *See Bhatia*, 834 P.2d at 581 ("If an explicit grant of discretion is mistakenly found, we risk giving deference to an agen-

## ANALYSIS

■ We are called upon to determine the appropriate basis for calculating the occupation tax. Section 59–5–67 levies a tax of two percent of the "value" of natural gas "at the well." The legislature did not define the base term "value," but it did explain that "the value at the well shall be the value established under a bona fide contract for the purchase of the same." Section 59–5–67(2)(b)(i). Enron and the Commission present differing interpretations of this statute.

The Commission held that "value," although not defined, is an unambiguous term. The Commission reasoned that the ordinary and usual meaning of value is the market value of the gas, which "includes all forms of compensation received by the petitioner in exchange for the sale of its gas." Since the reimbursements were of value to Enron, and were given to Enron pursuant to its natural gas contracts, they were deemed by the Commission to be compensation for the gas, and therefore taxable. Under the Commission's interpretation, "value at the well" includes any and all consideration received by the seller under a natural gas purchase contract.

Enron contends that not every item of exchange between a buyer and seller under a natural gas contract is necessarily given for the gas itself. In addition to selling the natural gas, Enron also conveys certain contractual rights to its purchasers under its natural gas contracts. Correspondingly, the gross amount Enron receives under such contracts actually has at least two relevant elements: (1) consideration given for the gas; and (2) consideration given for other elements of the contract, such as contractual rights. Enron asserts that the legislature intended that the occupation tax be assessed only against the value of the gas itself. Consequently, the occupation tax should not be assessed against consideration received by the seller in exchange for "non-gas" elements of the contract. Under Enron's interpretation, "value at the well" means the net value of the gas, which constitutes but one element of a natural gas contract, not the gross amount eventually received by the seller for all elements of the contract.

■ A plain reading of the statute supports Enron's interpretation. The statute expressly states that the relevant value is the *value of the gas at the well as established by the natural gas contract,* not the total value of the natural gas contract. This plain reading is further supported by considering other provisions of the act.[6] In subsection (1) of the statute, the legislature directed that the occupation tax on metalliferous minerals be based upon "the gross amount received for or the gross value of the metalliferous minerals sold." The Commission asserts that this surrounding language indicates that the legislature intended to tax natural gas production on a gross receipts basis in the same manner as metalliferous metals. We disagree. When setting forth the method of calculating the occupation tax on the production of natural gas, the legislature designated an entirely different base for the tax liability. It required that the tax be based upon the value

cy interpretation that is contrary to the legislature's own interpretation." (citing *Morton,* 814 P.2d at 589)).

All agencies are necessarily granted authority by statute to administer portions of the code. If such grants of administrative authority are misconstrued to be explicit grants of exclusive discretion to interpret statutory terms, the exception set forth in *Morton* would consume the rule because administrative grants are always present. *Cf. Ferro,* 828 P.2d at 514 n. 12 (misconstruing a grant of agency authority to make factual findings to be an explicit grant of discretion to interpret statutory terms would consume the rule in *Morton*). *Putvin's* passing reference to the Commission's grant of general adminis-

trative authority over the tax code should therefore not be misconstrued to be a finding of an explicit grant of exclusive discretion to interpret all statutory terms.

6.  Statutes should not be construed in a piecemeal fashion, but as a comprehensive whole. *Amax Magnesium Corp. v. State Tax Comm'n,* 796 P.2d 1256, 1258 (Utah 1990). "If there is doubt or uncertainty as to the meaning or application of the provisions of an act, it is appropriate to analyze the act in its entirety, in light of its objective, and to harmonize its provisions in accordance with the legislative intent and purpose." *Osuala v. Aetna Life & Casualty Co.,* 608 P.2d 242, 243 (Utah 1980).

of the gas "at the well," rather than the "gross amounts received." The legislature then taxed the two categories at different rates: one percent for metalliferous minerals; and two percent for nonmetalliferous minerals, such as natural gas. It is therefore apparent from the remainder of the act that the legislature's use of the term "at the well" when taxing natural gas production, rather than "gross amount received," indicates a deliberate legislative intent to tax natural gas production differently, i.e., by assessing only the value of the gas itself.

There is no dispute that the tax reimbursements have economic value to Enron and were given to Enron as part of its total compensation due under the purchase contract. The critical question, however, is whether the tax reimbursements were given to Enron in exchange for the gas itself or for some other "non-gas" element of the contract.

The tax reimbursements clearly did not compensate Enron for its production of the gas itself. It is undisputed that natural gas sellers and purchasers enter into reimbursement agreements in order to determine who will bear the costs of ad valorem taxes, and the risk of future increases, during the life of the contract. Sellers are reluctant to commit to a set price over an extended period of time where future tax increases might erode profits. Consequently, purchasers typically agree to reimburse the seller its ad valorem taxes, in whole or in part, in order to obtain a set price over an extended period of time. In other words, the tax reimbursements are given to Enron in return for contractual rights with their own independent value. It therefore follows that any consideration Enron receives in return for its promise of future performance is not consideration given for the gas itself. *Cf. Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159, 1167–68 (5th Cir.1988) ("take-or-pay" agreements which compensate producer for exclusive commitment of reserves are not part of price paid for the gas itself).

The fact that a natural gas purchaser is willing to absorb the ad valorem tax liability of the seller *in addition to* the value it pays for the gas itself, does not increase the value of the gas.[7] The "market value" of an item is typically defined as the amount a willing buyer would pay a willing seller. It is not the amount a willing buyer would pay a willing seller, *plus tax.*

It appears from the record that ad valorem tax reimbursements are a common practice in the industry. Had the legislature intended to assess occupation taxes against ad valorem tax reimbursements, it could have expressly stated that the tax reimbursements are to be included in determining value. Inasmuch as the legislature chose not to include such a provision, we may not imply one.[8] Terms not appearing

---

7. If Enron were not obligated to pay the ad valorem tax, and therefore did not collect any tax reimbursements, it would receive the same or more compensation for its production of the gas. The reimbursements are therefore only a transfer from Enron to its purchasers of an artificial cost of doing business imposed by the State in order to raise revenue, not an actual cost of production. Taxes simply do not add value to an item; they may add cost, but not value.

8. Under traditional rules of statutory construction, tax statutes are strictly construed in favor of the taxpayer so as to avoid the levying of taxes by implication. "In case of doubt they are construed most strongly against the government and in favor of the citizen." *Gould v. Gould,* 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917). *See also Ogden Union Railway and Depot Co. v. State Tax Comm'n,* 16 Utah 2d 23, 395 P.2d 57, 61 (1964) ("Problems of semantics are always difficult, especially where no specific meaning is assigned to them in the statutes, and we are to resolve doubts in favor of the taxpayer."); *Pacific Intermountain Express Co. v. State Tax Comm'n,* 8 Utah 2d 144, 146, 329 P.2d 650, 651 (1958) (citing *Gould*); *Superior Soft Water Co. v. State Tax Comm'n,* 843 P.2d 525, 529 (Utah App.1992). To extend section 59–5–67 beyond its express terms would defeat the goal of informing taxpayers in clear and unambiguous terms of the amount and nature of their tax obligations. *See generally,* Sutherland Stat. Const. § 66.01 (5th ed.).

Even if we were to accept the Commission's statutory interpretation as plausible, Enron's interpretation is likewise plausible. The statute would therefore be ambiguous and, in accordance with the foregoing rule, we would accept Enron's interpretation.

in a tax statute are not to be implied if "its plain meaning does not require such a construction." *Salt Lake County v. State Tax Comm'n,* 779 P.2d 1131, 1132 (Utah 1989). "Where the ordinary meaning of [statutory] terms results in an application that is neither unreasonably confused, inoperable, nor in blatant contradiction to the express purpose of the statute, it is not the duty of this Court to assess the wisdom of the statutory scheme." *West Jordan v. Morrison,* 656 P.2d 445, 446 (Utah 1982). We do not find section 59–5–67 unreasonably confused or inoperable. The plain language of the statute reveals a legislative intent to tax the value of the natural gas itself (as determined by the natural gas contract of the parties), not any and all value received by Enron under a natural gas contract. Inasmuch as this objective is attainable without taxing the ad valorem tax reimbursements, we will not extend section 59–5–67 by implication to tax ad valorem tax reimbursements. Consequently, we hold that ad valorem tax reimbursements are not part of the "value at the well," as that term is used in the statute, and therefore are not subject to occupation taxes.[9]

Despite the plain language of section 59–5–67, the Commission nevertheless asserts that its broad interpretation of the section is required in order to prevent natural gas producers from manipulating their contracts in order to reduce their taxes by separating out various costs and passing them on to purchasers as costs separate from the purchase of the gas itself. In response to a similar "manipulation" argument previously made by the Commission, the Utah Supreme Court has indicated: "The simple response to this argument is that the statute must be enforced as it is written, and as written, it does not prevent that type of manipulation." *Savage Indus., Inc. v. State Tax Comm'n,* 811 P.2d 664, 672 (Utah 1991). The same response applies here. By expressly referring to the valuation found in the contract, the legislature has deferred to the parties' method of calculation, at the risk of manipulation.

 If the Commission wishes to determine "value at the well" in a manner other than that selected by the legislature, it must seek a statutory amendment from the legislature. It may not simply "rewrite" the statute by interpreting it to read as it feels it should have been written. *Ferro,* 828 P.2d at 513–14 (agency may not impose additional requirements not contained within the statute). "The authority of administrative agencies to promulgate rules and regulations 'is limited to those regulations which are consonant with the statutory framework, and neither contrary to the statute *nor beyond its scope.'* " *Dusty's, Inc. v. State Tax Comm'n,* 842 P.2d 868, 871 n. 5 (Utah App.1992) (quoting *Crowther v. Nationwide Mut. Ins. Co.,* 762 P.2d 1119, 1122 (Utah App.1988) (emphasis added)). The Commission must therefore "leav[e] it to the legislature to clarify an intent to be more restrictive [than the language used], if such intent exists." *Salt Lake County v. State Tax Comm'n,* 779 P.2d at 1132.

## CONCLUSION

We hold that by basing the occupation tax on the value of the natural gas "at the well," the legislature opted not to tax the seller's gross receipts. We also hold that the Commission may not extend section 59–5–67 by implication to tax ad valorem tax reimbursements.

Inasmuch as the Commission had no statutory authority to levy occupation or conservation taxes against Enron's ad valorem tax reimbursements, the Commission's ruling is reversed. The Commission is hereby directed to return to Enron the taxes paid under protest.

GARFF and RUSSON, JJ., concur.

---

9. This position is consistent with the federal government's regulatory treatment of tax reimbursements. *See* 15 U.S.C. § 3320 (Supp.1991)

(tax reimbursements may be collected in addition to the maximum lawful price for natural gas).