**ENRON OIL AND GAS COMPANY, Successor to Belco Petroleum Corporation, Plaintiff and Appellant,**

v.

**STATE of Utah, DEPARTMENT OF NATURAL RESOURCES, DIVISION OF STATE LANDS AND FORESTRY, and the Director of State Lands, Defendants and Appellees.**

No. 910057.

Supreme Court of Utah.

Jan. 5, 1994.

Rehearing Denied April 18, 1994.

R. Paul Van Dam, Atty. Gen., for State Lands and Forestry, State of Utah, amicus Utah State Tax Comm'n, Dept. of Natural Resources, Director of State Lands, and amicus Utah State Bd. of Educ.

Steven F. Alder, Asst. Atty. Gen., for Dept. of Natural Resources, State Lands and Forestry, and State of Utah.

Gale K. Francis, Asst. Atty. Gen., for amicus Utah State Tax Comm'n.

J. Gary McCallister, Salt Lake City, for amicus Utah State Bd. of Educ.

A. John Davis, III, Dante L. Zarlengo, Salt Lake City, for Enron Oil & Gas.

Phillip William Lear, Salt Lake City, for amicus ANR Production Co., amicus Coastal Oil & Gas Corp., amicus CIG Exploration, Inc.

STEWART, Associate Chief Justice:

Enron Oil and Gas Company produces and sells gas from school trust lands that it leases from the state. Enron appeals from a district court decision granting summary judgment to the Utah Department of Natural Resources, Division of State Lands. The summary judgment affirmed the Division's assessment of royalties on ad valorem tax reimbursements paid to Enron by Mountain Fuel Supply Co. and Colorado Interstate Gas (CIG) pursuant to gas purchase contracts for gas produced on state lands. We affirm.

I.

The Division of State Lands audited Enron's royalty payments on 52 oil and gas leases on school trust lands in Uintah County.[1] Enron paid royalties to the State based on a price for gas that did not include ad valorem and severance tax reimbursements paid to Enron by Mountain Fuel and CIG. In 1987, the Division informed Enron that it

---

1. Enron owns 12 additional leases which were also subject to the Division's audit, but because those leases contain different royalty provisions, our ruling pertains only to the 52 leases.

owed $91,000 in royalty payments on the amount of the tax reimbursements. Enron appealed to the district court from a denial of a request for a redetermination of the royalty assessment. The district court held that the tax reimbursements were subject to royalty payments because they were part of the "market value" of the gas under the terms used in Enron's lease with the State.

On this appeal, Enron argues that ad valorem tax reimbursements paid to it by gas purchasers cannot be considered in determining the "market value" of the gas, as that term is used in the leases. Enron also asserts that including tax reimbursements as part of the market value or price of gas conflicts with the Natural Gas Policy Act (NGPA) of 1978, which sets the maximum lawful price for gas.

Under the state leases,[2] Enron agreed to pay the State a 12½% royalty based on the "reasonable market value at the well of all gas produced and saved or sold from the leased premises" and that "in no event shall the price for gas be less than that received by the United States of America for its royalties from gas of like grade and quality from the same field." In full, the lease royalty provision states:

> Gas—LESSEE also agrees to pay LESSOR twelve and one half per cent (12½%) of the *reasonable market value* at the well of all gas produced and saved or sold from the leased premises. Where gas is sold under a contract, and such contract ·has been approved in whole or conditionally by the LESSOR, the *reasonable market value of such gas for the purpose of determining the royalties payable hereunder shall be the price at which the production is sold, provided that in no event shall the price for gas be less than that received by the United States of America for its royalties*

*from gas of like grade and quality from the same field.*

(Emphasis added.)

During the audit period, Enron sold gas it produced from the Chapita Wells Unit Area to Mountain Fuel. Under the gas purchase agreement, Mountain Fuel agreed to pay Enron a price for its gas computed pursuant to the following provision:

> The price of any gas whose maximum base price is regulated by the FERC or by a properly constituted state authority at the time of delivery ("regulated gas") shall be the highest applicable base price, including all applicable escalations, on the date the gas is delivered.... *The total price for regulated gas shall consist of the base price,* reimbursements of costs borne by the Seller for which reimbursement by Buyer is permitted under the applicable statutes and regulations, *and tax reimbursements made pursuant to Section VII–3.*

(Emphasis added.) Under this contract it is clear that the "total price" paid Enron included the "base price" *and* "tax reimbursements."

Enron sold gas produced from the Natural Buttes Unit Area to CIG at a price to be computed pursuant to the following provision in the gas purchase contract:

> Subparagraph (c) of Paragraph 5.1 of ARTICLE V—PRICE shall be amended by adding thereto the following:
>
> *Such rate paid pursuant to this paragraph shall include the highest prices allowed by the Federal Energy Regulatory Commission (FERC) under Section 107(c)(5) of the Natural Gas Policy Act of 1978 (NGPA) for gas delivered to Buyer by Seller* from formations that qualify for such prices. Such rate shall change to conform to all such adjustments and escalations and any revisions on the date they

**2.** The leases were entered into pursuant to Utah Code Ann. § 65–1–18, *repealed by* 1988 Utah Laws ch. 121, § 18, which provided:

> All mineral leases issued by the board shall contain such terms and provisions as the board deems to be in the best interest of the state and shall provide for such annual rental and for such royalty as the land board shall deem fair

and in the best interest of the state of Utah, but the annual rental shall not be less than fifty cents per acre per annum nor more than one dollar per acre per annum and *the royalty shall not exceed 12½% of the gross value of the product at the point of shipment from the leased premises.*

(Emphasis added.)

become effective as to the sale of gas covered hereby.

(Emphasis added.) This provision makes clear that the price paid Enron included "the highest prices allowed by the Federal Energy Regulatory Commission."

## II.

The price of natural gas is regulated by the Federal Energy Regulatory Commission (FERC) (previously the Federal Power Commission), which sets the maximum price producers may charge for gas. Historically, gas producers sought to increase the amount they received for gas by requiring purchasers to pay, in addition to the stated price, an amount equal to the ad valorem and severance taxes that the producers paid to the state. Gas purchasers paid the amount of the taxes even though it was in addition to the maximum price permitted by the FERC. Thus, gas purchasers, although not legally liable for the taxes, paid more than the maximum price allowed, under the guise of assuming one of the producer's costs of production. As a result, the so-called tax reimbursements increased the price that the producers received for the gas.

There is a long-standing practice of gas producers requiring gas purchasers to pay tax reimbursements. *See, e.g., Amoco Prod. Co.,* 29 I.B.L.A. 234 (1977); *Wheless Drilling Co.,* 13 I.B.L.A. 21 (1973). In fact, the NGPA specifically allowed tax reimbursements to be added to the maximum price fixed:

(a) ... a price for the first sale of natural gas shall not be considered to exceed the maximum lawful price applicable to the first sale of such natural gas ... if such first sale price exceeds the maximum lawful price to the extent necessary to recover.

(1) State severance taxes attributable to the production of such natural gas and borne by the seller....

15 U.S.C. § 3320(a) (1982), *repealed by* 103 Stat. 158 (effective Jan. 1, 1993).

Whether Enron was obligated to pay a royalty on the tax reimbursement payments depends on whether the payments are part of the "reasonable market value" of the gas sold by Enron as that term is used in the state leases. The leases define "reasonable market value" as the price for which the gas is sold but not less than the price received by the United States.

Enron concedes that the market value of gas is the highest price that a willing buyer would agree to pay a willing seller. The stated price is not, however, the sole measure of market value in this case. Severance taxes are a cost of production for the *producer.* Shifting that cost to the *buyer* by a tax reimbursement is simply additional consideration to the seller. In short, the stated price plus tax reimbursements constitute the consideration that a willing buyer pays a willing seller and together they equal the "reasonable market value" of the gas. In *Enron Oil & Gas v. Lujan,* 778 F.Supp. 348, 352 (S.D.Tex.1991), *aff'd, Enron Oil & Gas Co. v. Lujan,* 978 F.2d 212 (5th Cir.1992), the court stated, "[R]oyalty is assessed on value of production as *reflected by the market. In the marketplace, Enron is able to sell its gas for a maximum legal price plus reimbursement of the severance tax.*" (Emphasis added.)

If Enron had agreed to sell the gas solely for the NGPA price, Enron would have paid the state severance taxes, thereby reducing its net proceeds from the sale. Because the buyers were willing to pay a price higher than the stated price by the amount of the severance taxes imposed on the seller, the true market price or value received by Enron was the stated price plus tax reimbursements. *See Enron Corp.,* 106 I.B.L.A. 394, 397 (1989). To rule otherwise would allow Enron to "determine the value of production simply by allocating the value they will receive under different categories designated as being other than the 'price,' yet all relating to the production." *Amoco Prod. Co.,* 29 I.B.L.A. 234, 237–38 n. 2 (1977).

The "reasonable market value" or "price at which the production is sold" under Enron's lease is explicitly stated in the Mountain Fuel contract: "The total price for regulated gas shall consist of the base price ... and tax reimbursements." The language in the CIG gas purchase contract is not as clear with respect to specifying consideration to be paid

Enron, but it is nevertheless clear that the total consideration is the stated price plus the tax reimbursement. That agreement refers to the "highest prices allowed by Federal Energy Regulation Commission."

Enron's position is especially untenable in view of the lease language providing that "in no event shall the price for gas be less than that received by the United States of America for its royalties from gas of like grade and quality from the same field." This provision places a floor on the price of gas for royalty calculations and ensures that the leases are "in the best interest of the state," as required by Utah Code Ann. § 65–1–18 and the terms of the state school land trust. The price of gas for determining federal royalties has consistently been held to include tax reimbursements. *E.g., Enron Oil & Gas Co. v. Lujan,* 978 F.2d 212, 216 (5th Cir. 1992); *Hoover & Bracken Energies, Inc. v. United States Dep't of Interior,* 723 F.2d 1488, 1492 (10th Cir.1983); *Amoco Prod. Co.,* 29 I.B.L.A. 234, 238 (1977); *Wheless Drilling Co.,* 13 I.B.L.A. 21, 32 (1973). "If the market value or amount realized is higher than the federal floor, royalties must be paid on the basis of market value or amount realized. Conversely, if the ... market value is lower than the federal floor, royalties must be paid on the basis of the federal floor." *State v. Moncrief,* 720 P.2d 470, 474 (Wyo.1986). If Enron were to sell gas based at a price less than the floor provision when the reasonable market value would yield a higher price, the Division could reject such a contract. *See Moncrief,* 720 P.2d at 474–75.

Enron argues that including the tax reimbursements for royalty purposes unjustly enriches the State because state school section gas is not subject to ad valorem taxes and if the State were to take its gas in kind, it could receive only the NGPA price without the tax reimbursement. The argument is without merit for two reasons. First, it assumes that the only value to the State of gas in-kind is what the State could sell the gas for. That is not so. "If ... the Government were to take its royalty interest in kind, the implicit assumption would be that it [has] a use for the gas. The *value of [the] gas is, therefore, properly computed as the price which the* *[State] would pay on the open market if it were purchasing the gas as an ordinary purchaser." Hoover & Bracken Energies, Inc.,* 52 I.B.L.A. 27, 37 (1981) (emphasis added).

Second, Enron's argument seeks to capture for itself the benefit of the tax immunity that the State enjoys. A similar argument based on federal immunity to state taxation was rejected by the United States Court of Appeals for the Tenth Circuit. That court held that the benefit of the federal government's immunity from state taxation flows to the federal government, not to lessees of federal lands:

> "The fact that the United States cannot be assessed state severance tax does not depreciate the *value* of the gas to it. Immunity from state taxation is a function of the Federal Government's sovereignty, which prevents the state from assessing a severance tax. This benefit flows to the Government, not the lessor."

*Hoover & Bracken Energies, Inc. v. United States Dep't of Interior,* 723 F.2d 1488, 1491 (10th Cir.1983) (emphasis in original) (quoting *Hoover & Bracken Energies, Inc.,* 52 I.B.L.A. 27, 37 (1981)). Clearly the State, not Enron, is entitled to the benefit of the immunity of state lands from taxation.

The argument is made by the dissent that Enron receives the tax reimbursements in return for its commitment to a long-term contract, not as consideration for the gas itself. There is, however, no practical difference between consideration for the gas and consideration for a commitment to a long-term contract. Gas is typically sold pursuant to long-term contracts. In any event, the distinction the dissent draws is not in accord with economic realities. Severance taxes are a seller's cost of production, and when such a cost is paid for by a buyer, the value of the gas is increased accordingly. *See Amoco Prod. Co.,* 29 I.B.L.A. 234, 237–38 n. 2 (1977).

Finally, Enron claims that assessing royalties on the tax reimbursements violated the Natural Gas Policy Act of 1978. This argument has been rejected by the federal courts and is without merit. *E.g., Enron Oil & Gas Co. v. Lujan,* 978 F.2d 212, 216 (5th Cir. 1992); *Hoover & Bracken Energies, Inc. v.*

*United States Dep't of Interior*, 723 F.2d 1488, 1491–92 (10th Cir.1983).

Affirmed.

HALL and HOWE, JJ., concur.

DURHAM, Justice, dissenting:

Two of Enron's leases are at issue in this appeal, one entered into on January 2, 1953, by Continental Oil Co. (Enron's predecessor in interest) and the State Land Board, and the second entered into on April 10, 1964, by Midwest Oil Corporation (also a predecessor in interest) and the State Land Board. Both leases establish that Enron must pay 12½% of the "reasonable market value" at the well of all gas produced and saved or sold from the leased premises. The leases define reasonable market value as the "price at which the production is sold" in a contract either approved or conditionally approved by the lessor.

Enron and the Division differ on the proper meaning of the language "price at which the production is sold." The Division refers to section 65–1–18 of the Utah Code:

All mineral leases issued by the board shall contain such terms and provisions as the board deems to be in the best interest of the state and shall provide for such annual rental and for such royalty as the land board shall deem fair and in the best interest of the state of Utah, but the annual rental shall not be less than fifty cents per acre per annum nor more than one dollar per acre per annum and *the royalty shall not exceed 12½% of the gross value of the product at the point of shipment from the leased premises.*

Utah Code Ann. § 65–1–18 (Supp.1967) (repealed 1988) (emphasis added).[1] The Division contends that for royalty purposes, price is equivalent to "the gross value of the product at the point of shipment." Gross value, as defined by the federal courts and the oil and gas industry in general, includes tax reimbursements. *See, e.g., Enron Oil & Gas*

*Co. v. Lujan*, 978 F.2d 212, 215 (5th Cir. 1992); *Hoover & Bracken Energies, Inc. v. United States Dep't of Interior*, 723 F.2d 1488, 1492 (10th Cir.1983), *cert. denied*, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); *Wheless Drilling Co.*, 13 I.B.L.A. 21, 30–31 (1973). The majority has essentially adopted the Division's broad definition of gross value, a definition derived from section 65–1–18, into the lease language.

The words used by the parties to these lease agreements, not the language of section 65–1–18, are the primary indication of the content of their promises. In issuing or renewing these leases, the Division could easily have used the exact language now found in section 65–1–18 to describe the royalty assessment, but it did not. The court's function is to give the lease language its ordinary meaning, not to read statutory material into it. Furthermore, the Division could have used a royalty provision similar to that used in the section dealing with royalty payments for oil, section 4(a) of the lease. Section 4(a) states in relevant part:

When paid in money, the royalty shall be calculated upon the reasonable market value of the oil at the well, including any subsidy or extra payment which the lessees, or any successor in interest thereto, may receive, without regard as to whether such subsidy or extra payment shall be made in the nature of money or other consideration. . . .

The fact that the lease specifically makes provision for any "subsidy or extra payment" which may be received by the lessee in exchange for oil production implies that subsidies and extra payments were contemplated in the preparation of the lease and that the parties chose to include them in the royalty provisions for oil, but not for natural gas.

Finally, the majority, by adopting the Division's argument, misinterprets the significance of section 65–1–18 with respect to the computation of royalties. Section 65–1–18 exists to create a cap on the royalty amounts.

---

1. The text of section 65–1–18 relied on by both parties, the majority, and this dissent was not adopted until 1967. *Compare* Utah Code Ann. § 65–1–18 (1953) *with* Utah Code Ann. § 65–1–18 (Supp.1967). As the parties are unconcerned with the discrepancy and both leases have since been renewed under the current text of section 65–1–18, I note the distinction purely for informational purposes.

Under the statute, royalties may not "*exceed* 12½% of the gross value of the product at the point of shipment from the leased premises." Utah Code Ann. § 65–1–18 (emphasis added). This statute does not establish "gross value" as the basis for calculating royalties. In fact, as long as the royalty does not exceed 12½% of the gross value of the gas from the point of shipment, section 65–1–18 is not relevant to the task of determining the value of the state's royalty share.

### THE GAS PURCHASE AGREEMENTS

The most compelling indication that the "price at which the production is sold" does not mean what the majority claims is found in the gas purchase agreements Enron entered into with Colorado Interstate Gas Co. ("CIG") and Mountain Fuel Supply Co. ("Mountain Fuel"). These agreements established the price at which Enron sold the gas. Article V, section 5.1 of the Enron–CIG agreement contained the original price provision. Provisions (A) and (C) established that after 1982, all gas purchased by CIG would be bought at the national ceiling price provided by the Federal Power Commission ("FPC") (now the Federal Energy Regulatory Commission or "FERC"). However, in an amendment to the gas purchase agreement dated May 21, 1981, the parties agreed to increase the rate prior to 1982. The amendment stated that the rate would include

> the highest prices allowed by the Federal Energy Regulatory Commission (FERC) under Section 107(c)(5) of the Natural Gas Policy Act of 1978 (NGPA) for gas delivered to Buyer by Seller from formations that qualify for such prices. Such rate shall change to conform to all such adjustments and escalations and any revisions on the date they become effective as to the sale of gas covered hereby.

The provisions for "price" in the original gas purchase agreement and each of its amendments make no reference to tax reimbursements.

Under the Enron–CIG agreement, the payment of tax reimbursements is governed by article V of exhibit A, entitled "General Conditions Gas Purchase Agreement." This provision is not included in the article dealing with price, nor is it considered an element of the price. According to the gas purchase agreement, the tax reimbursement, while a part of the total value of the contract, is not part of the value of the gas itself. *See Belnorth Petrol. Corp. v. Tax Comm'n*, 845 P.2d 266, 270 (Utah Ct.App.1993) ("The fact that a natural gas purchaser is willing to absorb the ad valorem tax liability of the seller *in addition to* the value it pays for the gas itself, does not increase the value of the gas." (emphasis in original)).[2]

The Enron–Mountain Fuel gas purchase agreement, though not as clear as the CIG agreement, compels the same conclusion. Article VII–1(a) of the Mountain Fuel agreement sets the price of gas purchased under the agreement: "The price of any gas whose maximum base price is regulated by the FERC or by a properly constituted state authority at the time of delivery ("regulated gas") shall be the highest applicable base price, including all applicable escalations, on the date the gas is delivered." Article I, section 15 of the agreement defines base price as "the wellhead price per MMBTU [million British thermal units] of gas, exclusive of any adjustments for taxes and production-related costs such as compression, gathering, processing, treating or other similar costs." However, the majority has identified the base price as the "price at which the production is sold" for royalty purposes. It has concluded that we must use "total price" as defined in section VII–1(a) of the Mountain Fuel agreement as the basis for calculating Enron's royalty payments, i.e., total price includes base price, plus cost and tax reimbursements allowed by statute and made pursuant to the agreement.

I agree with Enron that the "price at which the production is sold" under both gas purchase agreements is the base price, excluding tax reimbursements. The majority incorrectly assumes that all value given by the buyer in the gas purchase agreement is exchanged for a unit of production. I disagree. The tax reimbursement provisions are properly viewed as a separate part of the

2. Belnorth Petroleum Corporation is the prede-    cessor in interest to Enron.

contract, distinct from the price terms. Although I recognize that the tax reimbursements are a part of the total economic value associated with the purchase agreements, I believe that they should not be viewed as having been given in exchange for the gas itself.

In the natural gas industry, producers typically enter into long-term contracts with buyers. A buyer is usually a transmission company which must extend its pipelines to the source of supply. This capital outlay may be justified only if the transmission company is assured a long-term supply of gas. Sellers, however, are unwilling to commit to long-term contracts with fixed prices given that future tax increases could turn a profitable contract into a poor deal. Therefore, the buyer is willing to give value for a long-term contract. The buyer usually bears the costs of ad valorem taxes (severance taxes) and the risk of future tax increases during the life of the contract. *See Belnorth,* 845 P.2d at 270. Thus, Enron receives tax reimbursements in return for its commitment to a long-term contract, not as consideration for the gas itself. *Cf. Diamond Shamrock Exploration Corp. v. Hodel,* 853 F.2d 1159 (5th Cir.1988) (payments made pursuant to "take-or-pay" provisions do not represent part of the value of the gas); *see also* Earl A. Brown, *The Law of Oil and Gas Leases* § 6.09(1)(A) (2d ed. 1984).

I would hold that for royalty purposes, the reasonable market value of the gas produced and saved or sold by Enron is determined by the unit price, exclusive of tax reimbursements, at which the production is sold under the gas purchase agreements entered into with CIG and Mountain Fuel.

### THE "FEDERAL FLOOR" LEASE PROVISION

Notwithstanding the foregoing determination of the correct method for calculating reasonable market value, I also address the Division's argument concerning the "federal floor" royalty provision contained in the lease agreements. The Land Board's lease agreements contain the following clause:

Gas—LESSEE also agrees to pay to LESSOR twelve and one half per cent (12½%)

of the reasonable market value at the well of all gas produced and saved or sold from the leased premises. Where gas is sold under a contract, and such contract has been approved in whole or conditionally by the LESSOR, the reasonable market value of such gas for the purpose of determining the royalties payable hereunder shall be the price at which the production is sold, *provided that in no event shall the price for gas be less than that received by the United States of America for its royalties from gas of like grade and quality from the same field.*

(Emphasis added.) In its brief, the Division characterized this provision as requiring that "the price for gas used to determine the royalty shall not be less than the price used to determine the royalties 'received by the United States of America for its royalties from gas of like grade and quality from the same field.'" I am in complete agreement with this reading of the lease language. The majority, however, goes further, concluding that this provision requires that the state receive at least as much as the federal government receives in royalties. I cannot accept this interpretation.

United States lease royalties are based on more than just the unit price of production. In *Hoover & Bracken Energies, Inc. v. United States Department of Interior,* 723 F.2d 1488, 1492 (10th Cir.1983), the Tenth Circuit posed this question: "What is the value of production? Is it contract price, or contract price, plus severance? The latter is the value of production for payment of royalties." In *Wheless Drilling Co.,* 13 I.B.L.A. 21 (1973), the Interior Board of Land Appeals ("IBLA") came to the conclusion that tax reimbursements were, in fact, given as consideration for natural gas production:

It seems obvious to us that the buyer thus is paying to the seller an amount greater than the established field price for the natural gas it purchases from the #1 T.L. James well. It follows, therefore, that it is reasonable to compute the Federal royalty of the natural gas taken from this well on a unit value consisting of the field price established by FPC plus the amount of the severance tax reimbursed by the buyer.

13 I.B.L.A. at 30. Since *Wheless,* federal courts addressing this issue have taken the position that tax reimbursements are given as consideration for the gas itself and, as such, must be included in the computation of the United States' royalty share. *Enron Oil & Gas Co. v. Lujan,* 978 F.2d 212, 215 (5th Cir.1992); *Hoover,* 723 F.2d at 1490.

However, in *Wheless, Hoover,* and other federal cases cited by the Division and the majority, the IBLA and federal courts were interpreting 30 C.F.R. § 221.47, which states:

> The value of production, for the purpose of computing royalty shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters. *Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof* or less than the value computed on such reasonable unit value as shall have been determined by the Secretary.

(Emphasis added.) *Wheless,* for example, focused on the interpretation of the term "gross proceeds" as contained in 30 C.F.R. § 221.47. *Wheless* established that for purposes of federal royalties, gross proceeds include "the established field price for the natural gas plus any additional sums paid by the purchaser of the gas to the unit operator as consideration for the purchase of gas from the unit of which the federal lease is a part." 13 I.B.L.A. at 30–31.[3]

In the case at hand, 30 C.F.R. § 221.47 has no application. As I mentioned previously, section 65–1–18 does not require that the state's royalty be based on "gross value" or "gross proceeds," as does the federal statute. The state's royalty, as established by the leases in question, is based on the "reason-able market value," as indicated by the price of the gas sold under a contract. Moreover, our standard of review is entirely different from that employed by the federal courts. In *Wheless,* the IBLA was construing its own regulations. 13 I.B.L.A. at 30–31. In *Hoover,* the court deferred to the IBLA's interpretation of its own regulations. 723 F.2d at 1489–90. We are not required to grant deference to the Division. Rather, we may decide for ourselves the proper basis for the state's royalty share. The federal cases relied on by the Division and the majority are thus entirely distinguishable and not, in my view, persuasive.

Furthermore, as Enron points out in its brief, both the Chapita Wells and the Natural Buttes Units consist predominantly of oil and gas leases issued by the United States. The gas produced from these United States leases is sold under the same gas purchase agreements as the gas sold from the wells on state land. Both CIG and Mountain Fuel pay exactly the same rate for gas from state and federal lands. Enron's lease agreement with the state merely stipulates that the price received for production under approved natural gas purchase agreements shall not be less than the price received for production on federal leases. It certainly does not require that all elements of royalty valuation be the same for state leases as for federal leases. Therefore, I would hold that Enron is in compliance with the "federal floor" provision of its lease because the prices for gas sold from state and federal lands in the Chapita Wells Unit Area and the Natural Buttes Unit Area are identical.

ZIMMERMAN, C.J., concurs in the dissenting opinion of DURHAM, J.

HALL, J., acted on this case prior to his retirement.

---

**3.** Even if Utah royalties were based upon "gross value," we would not necessarily include tax reimbursements in the calculation, because, as observed earlier, tax reimbursements are not necessarily given as consideration for the natural gas itself, but for other economic value associated with the contract.